# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

| | |
|---|---|
| ALBERTVILLE CITY BOARD OF EDUCATION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No.: 4:19-cv-00025-SGC ) |
| PATRICIA MOORE, *as Parent and Next Friend of S.B., a minor*, | ) ) ) |
| Defendant. | ) ) |

## MEMORANDUM OPINION [1]

The Albertville City Board of Education (the "Board") commenced this action, seeking review of an administrative decision determining an individualized education program ("IEP") proposing to advance S.B. to kindergarten for the 2017-2018 school year denied the child the free and appropriate public education ("FAPE") guaranteed to him by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.* (Doc. 1). Pending before the undersigned is a motion requesting access to the sealed administrative record through the court's CM/ECF system, filed by Patricia Moore, as parent and next friend of S.B., a minor. (Doc. 20). The court provided Ms. Moore with a paper copy of the sealed

---

[1] The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 6).

administrative record shortly after she filed her motion. Therefore, the motion (Doc. 20) is due to be denied as moot. Also pending before the undersigned is the Board's motion for judgment on the administrative record. (Doc. 15). For the reasons discussed below, the Board's motion is due to granted in part and denied in part, and this case is due to be remanded to the administrative law judge ("ALJ") who issued the decision at issue.

## I. Relevant Facts

S.B. was born on May 24, 2012. (A.R. at 106).[2] At eighteen months of age, he was diagnosed with moderate to severe autism. (*Id.* at 116-17). He also suffers from a milk allergy so severe that even dermal contact with a product containing milk risks a life-threatening anaphylactic reaction. (*Id.* at 119, 123-30). After S.B. was determined eligible to receive special education services, he began an early intervention program in the Albertville City Schools ("ACS") system during the 2015-2016 school year. (*Id.* at 133). He was enrolled in the ACS pre-kindergarten program for the 2016-2017 school year. (*Id.* at 145).

S.B.'s "IEP Team," comprised of school officials, teachers, Ms. Moore, and other persons with knowledge of S.B.'s unique needs, met in the spring of 2017 to develop S.B.'s IEP for the 2017-2018 school year. (*Id.* at 617-18). Ms. Moore believed her son should stay in pre-kindergarten for another year. (*Id.* at 153-54,

---

[2] Citations to "A.R." refer to the pagination of the administrative record.

617-18, 634-35). The other members of S.B.'s IEP Team, including S.B.'s general education teacher for pre-kindergarten, special education teacher, and speech language pathologist, believed S.B. should advance to kindergarten. (*Id.* at 617-19, 636). After her opinion regarding S.B.'s placement for the 2017-2018 school year was rejected, Ms. Moore enrolled her son in a private pre-kindergarten program. (*Id.* at 634-35).[3] She also requested a due process hearing, alleging the ACS violated the IDEA in its treatment of S.B and seeking to recoup the cost of educating S.B. privately for the 2017-2018 school year, which she testified was approximately $28,000. (*Id.* at 158-59, 215, 408-13).

After a two-day hearing, the ALJ determined S.B.'s proposed IEP for the 2017-2018 school year denied him a FAPE. (*Id.* at 398-99). The ALJ found advancement of S.B. to kindergarten was not appropriate because (1) assessments indicated that in the spring of 2017, S.B. was functioning at the developmental level of a two-and-a-half-year-old child; (2) S.B.'s intellectual limitations and difficulty communicating with peers and adults prevented him from protecting himself from exposure to milk products; (3) the kindergarten classroom would have a greater student-to-teacher ratio; (4) the ACS could not ensure S.B. would have a dedicated aide in kindergarten; (5) given the greater student-to-teacher ratio in the kindergarten classroom and the possibility S.B. would not have a dedicated aide there, S.B. would

---

[3] Ms. Moore re-enrolled S.B. in the ACS system for the 2018-2019 school year. (*Id.* at 159, 164).

lack the supervision necessary to ensure he did not come in contact with milk products; and (6) S.B. was physically small for his age. (*Id.* at 398-99). The ALJ further faulted the proposed IEP because, notwithstanding S.B.'s behavioral issues, the IEP did not provide for the training of a para-educator to ensure behavioral and educational integrity or include a behavior intervention plan developed by a board-certified behavior analyst ("BCBA"). (*Id.* at 398-99).

After determining S.B.'s proposed IEP for the 2017-2018 school year denied him a FAPE, the ALJ determined the private pre-kindergarten program in which Ms. Moore enrolled S.B. for the 2017-2018 school year provided appropriate services to S.B. and that the equities weighed in favor of requiring the Board to reimburse Ms. Moore in the amount of $14,000. (*Id.* at 20-23).

## II. Standard of Review & Burden of Proof

The IDEA establishes a substantive right to a FAPE for certain children with disabilities. *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 993 (2017) (citing *Bd. of Ed. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176 (1982)). A FAPE includes both "special education" – defined as "specially designed instruction . . . to meet the unique needs of a child with a disability" – and "related services" – defined as "supportive services . . . required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(9), (26), (29). The special education and related services to be

provided to a particular disabled child are documented in a written statement called an IEP. *Id.* at §§ 1401(14), 1414(d). To provide a FAPE, an IEP must be "'reasonably calculated to enable the student to receive educational benefits.'" *Endrew F. ex rel. Joseph F.*, 137 S. Ct. at 995-96 (quoting *Rowley*, 458 U.S. at 204). The Supreme Court has also articulated the standard as requiring an IEP to be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 998-99. "Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* at 999; *see also Weiss by Weiss v. Sch. Bd. of Hillsborough Cty.*, 141 F.3d 990, 998 (11th Cir. 1998) (emphasizing school board was not required to "maximize [disabled child's] potential" or "provide an education according to the dictates of [the child's parents], notwithstanding their unequivocal right to participate in making educational decisions").

If a local educational agency does not provide a FAPE to a disabled child in a timely manner, the agency may be required to reimburse the cost of educating the child in a private school. *Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1312 (11th Cir. 2003) (citing 20 U.S.C. § 1412(a)(10)(C)(ii)). A disabled child's parent may seek reimbursement through a due process hearing before a state or local educational agency. *Endrew F. ex rel. Joseph F.*, 137 S. Ct. at 994 (citing 20 U.S.C. § 1415(f) and (g)). At the conclusion of the administrative proceedings,

the losing party may seek redress in state or federal court. *Id.* (citing 20 U.S.C. § 1415(i)). The substantive questions at both the administrative level and for the federal district court are (1) whether the local educational agency failed to provide a FAPE, (2) whether the private school provides appropriate education and services, and (3) whether the equities warrant reimbursement in full or part. *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230 (2009); *Florence Cty. Sch. Dist. Four v. Carter by and through Carter*, 510 U.S. 7 (1993); *Sch. Comm. Of Burlington, Massachusetts v. Dep't of Educ. of Massachusetts*, 471 U.S. 359 (1985).

"[G]reat deference must be paid to the educators who develop the IEP," and at the administrative phase the party challenging an IEP bears the burden of proving the program is inappropriate. *Devine v. Indian River Cty. Sch. Bd.*, 249 F.3d 1289, 1291-92 (11th Cir. 2001). When review of an administrative decision is sought in federal district court, the burden of proof falls on the party challenging the decision. *L.J. ex rel. N.N.J. v. Sch. Bd. of Broward Cty.*, 850 F. Supp. 2d 1315, 1321 (S.D. Fla. 2012); *Pickens Cty. Sch. Dist. v. E.W. by and through R.W.*, 2011 WL 13272826, at *17 (N.D. Ga. June 11, 2011).

The standard of review to be applied by a federal district court when reviewing an administrative decision under the IDEA has been described as "puzzling" and "somewhat confusing." *Walker Cty. Sch. Dist. v. Bennett ex rel. Bennett*, 203 F.3d 1293, 1297 (11th Cir. 2000) (quoting *Capistrano Unified Sch. Dist. v. Wartenberg*,
6

59 F.3d 884, 891 (9th Cir. 1995); *Jefferson Cty. Bd. of Educ. v. Alabama Dep't of Educ.*, 853 F.2d 853, 856 (11th Cir. 1988)).  The statute instructs a reviewing court to "receive the records of the administrative proceedings," "hear additional evidence at the request of a party," and "basing its decision on the preponderance of the evidence, [] grant such relief as [it] determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).[4]  Both the Supreme Court and the Eleventh Circuit have noted the IDEA's judicial review provision contemplates an "independent" ruling by a reviewing court.  *Rowley*, 458 U.S. at 205; *Jefferson Cty. Bd. of Educ.*, 853 F.2d at 856.  The Eleventh Circuit also has described a district court's task in an IDEA case as to "conduct[] an *entirely* de novo review of the ALJ's findings." *Sch. Bd. of Collier Cty., Florida v. K.C.*, 285 F.3d 977, 983 (11th Cir. 2002) (citing *Rowley*, 458 U.S. at 205); *CP v. Leon County Sch. Bd. Florida*, 483 F.3d 1151, 1156 n.4 (11th Cir. 2007) (citing *K.C.*, 285 F.3d at 983).

At the same time, the Supreme Court has instructed, "[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206.  According to the Court, the statutory obligation of a reviewing court to receive

---

[4] Summary disposition of an IDEA case has been deemed appropriate even when facts are in dispute. *Loren F.*, 349 F.3d at 1315.

the records of the administrative proceedings "carries with it the implied requirement that due weight shall be given to these proceedings." *Id.* The Eleventh Circuit has made the case for deference in stronger terms, stating, "[A]dministrative factfindings 'are considered to be prima facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why.'" *Loren F.*, 349 F.3d at 1314 n.5 (quoting *MM ex rel. DM v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 531 (4th Cir. 2002)).

However, the Eleventh Circuit also has stated "the extent of the deference to be given to the administrative decision is left to the sound discretion of the district court[,] which must consider the administrative findings but is free to accept or reject them." *Walker Cty. Sch. Dist.*, 203 F.3d at 1297-98 (citing *Jefferson Cty. Bd. of Educ.*, 853 F.2d at 856; *Doe v. Alabama Dep't of Educ.*, 915 F.2d 651 (11th Cir. 1990)). Alabama federal district courts have observed "[o]ne strand of authority suggests that the degree of deference a district court should extend to IDEA administrative determinations turns on whether a particular decision implicates the agency's educational expertise." *Escambia Cty. Bd. of Educ. v. Benton*, 406 F. Supp. 2d 1248, 1257 n.7 (S.D.Ala. 2005); *Jefferson Cty. Bd. of Educ. v. Lolita S.*, 977 F. Supp. 2d 1091, 1110 (N.D. Ala. 2013) (citing *Benton*), *aff'd*, 581 F. App'x 760 (11th Cir. 2014). They also have noted authority indicating "a greater measure of deference is warranted when a hearing officer's findings appear thorough and careful . . . or where the administrative findings turn on credibility determinations." *Benton*,

406 F. Supp. 2d at 1257 n.7 (internal quotation marks omitted); *see also Lolita S.*, 977 F. Supp. 2d at 1110 (citing *Benton*).

## III. Discussion

### A. S.B.'s Developmental Age

The ALJ determined S.B.'s proposed advancement to kindergarten was inappropriate in part because assessments indicated that in the spring of 2017 S.B. was functioning at the developmental level of a two-and-a-half-year-old child. (A.R. at 398-99). The assessments to which the ALJ refered are a Verbal Behavior Milestones Assessment and Placement Program ("VB-MAPP") administered in February 2017 and an update to that VB-MAPP made in April 2017. The February 2017 VB-MAPP indicated S.B. was a "Level 2 learner with emerging [L]evel 3 skills," corresponding to the approximate development and linguistic functioning of a child between the ages of one-and-a-half years and two-and-a-half years. (*Id.* at 475). The update to that VB-MAPP made in April 2017 revealed S.B. had gained Level 2 and Level 3 skills since February. (*Id.* at 684).

Testimony given during the hearing indicated the results of a VB-MAPP are used to develop an IEP and measure a child's progress. (*Id.* at 69-70, 136-37, 199). There was no testimony suggesting the adjusted age a VB-MAPP assigned to a child with respect to development and linguistic functioning correlates to the grade into which the child should be placed. Additionally, in determining the placement issue,

9

the ALJ did not consider that although the VB-MAPP administered to S.B. in February 2017 indicated regression when compared to the VB-MAPP administered to him in October 2016, the update made to S.B.'s VB-MAPP in April 2017 showed progress when compared to either the October 2016 or the February 2017 VB-MAPPs.  (*Id.* at 300-02, 324-25).

More importantly, the results of the VB-MAPP administered to S.B. in February 2017 and updated in April 2017 were not the only data considered in developing S.B.'s proposed IEP for the 2017-2018 school year.  An Annual Goal Progress Report dated June 1, 2017, indicated that by the end of May 2017, S.B. had mastered four of the seven measurable annual goals included in his IEP for the 2016-2017 school year and made some progress with respect to the three goals he had not mastered.  (*Id.* at 663-68).  The Board also claims a report generated from data collected by S.B.'s general education teacher over the course of the 2016-2017 school year (the "Teaching Strategies GOLD" report) showed that as of Spring 2017, S.B. was performing at or about grade-level standard in a majority of sixty-four domains evaluated. (Doc. 15-1 at 7, 21; A.R. at 654-59).  Tara Wilson, the Special Education Coordinator for ACS, testified the determination S.B. should advance to kindergarten took into account not only the VB-MAPP results, but also the evidence regarding S.B.'s progress regarding his measurable annual goals and attainment of

skills commensurate with those demonstrated by his grade-level peers. (A.R. at 43-40, 95-96, 311-20, 353-54, 364-65).

Furthermore, based on the results of the VB-MAPP administered to S.B. in February 2017 and updated in April 2017, the BCBA who administered the evaluation recommended social skills be an emphasis of S.B.'s future programming and, in particular, that S.B. work on peer manding and reciprocal conversation with both peers and adults. (*Id.* at 684). Both Ms. Wilson's testimony and other evidence indicate the BCBA's recommendation was another factor in S.B.'s proposed placement for the 2017-2018 school year and, more particularly, that school officials believed the best way for S.B. to improve his social skills was to be in a kindergarten classroom with his same-age peers because S.B. was familiar with those children from the pre-school classroom and those children would model age-appropriate behavior for S.B. (*Id.* at 306-07, 326-27, 361, 619, 636).

The ALJ's decision does not mention, analyze, or weigh the June 2017 Annual Goal Progress Report, the Teaching Strategies GOLD report, or the recommendation or opinions regarding how to best serve S.B.'s needs with respect to social skills. Ms. Moore strongly disputed the accuracy and reliability of the June 2017 Annual Goal Progress Report. (*Id.* at 161-62, 165-69, 192-97, 202-08, 218-20, 225-30). Moreover, the undersigned is unable to interpret the Teaching Strategies GOLD report, and Ms. Wilson, the only school official who testified at the administrative

hearing, demonstrated a limited understanding of the report.  (*Id.* at 311-12, 356-59, 367-69).  To the extent Ms. Moore's testimony calling the June 2017 Annual Goal Progress Report into question was credible and the Teaching Strategies GOLD report was entitled to little weight, the administrative record may have supported a determination S.B. was not ready for kindergarten, regardless of any benefit he would have received from interaction with his same-age peers.  However, absent some discussion of this other evidence and, in particular, a credibility determination regarding Ms. Moore's testimony insinuating the June 2017 Annual Goal Progress Report was, at best, mistaken and, at worst, falsified, the evidence contained in the administrative record does not preponderate in favor of the ALJ's determination it was developmentally inappropriate for S.B. to advance to kindergarten.[5]

### B. S.B.'s Milk Allergy

The ALJ determined S.B.'s proposed advancement to kindergarten was inappropriate in other part because S.B. could not protect himself from exposure to milk products and that in the kindergarten classroom he would lack the supervision necessary to compensate for his inability to protect himself.  (*Id.* at 398-99).  The "related services" required to provide a FAPE include measures taken to address food allergies.  *See A.S. v. Trumbull Bd. of Educ.*, 414 F. Supp. 2d 152, 178 (D.

---

[5] Here, the undersigned also notes she has located no authority that would support a finding a child's physically small size supports a determination his advancement to the next grade level constitutes the denial of a FAPE.

Conn. 2006) (holding issues of student safety, such as a claim that a school is unhealthy for a disabled child, may properly be raised in a substantive challenge under the IDEA) (citing *Lillbask ex rel. Mauclaire v. State of Connecticut Dep't of Educ.*, 397 F. 3d 77, 93 (2d Cir. 2005)). The question here is whether the ALJ had a factual basis for determining safety concerns related to S.B.'s milk allergy made S.B.'s advancement to kindergarten inappropriate.

The administrative record supports the ALJ's finding of fact that S.B. could not have protected himself from exposure to milk products. Both parties submitted evidence showing S.B. had limited communication and social skills that, for example, reasonably could be expected to compromise his ability to let an adult know he had touched or consumed milk. Moreover, general experience and common sense suggest that even a five-year-old child without developmental delays or communication difficulties should not be expected to be able to avoid all contact with any product that contains milk.

However, the administrative record does not support the ALJ's finding of fact that in the kindergarten classroom S.B. would have lacked the supervision necessary to ensure his safety with respect to his severe milk allergy. The proposed IEP for the 2017-2018 school year provided S.B. with 420 minutes of support from special education staff on a daily basis within S.B.'s learning environment. (A.R. at 630). It also provided that a teacher, special education teacher, or aide would provide

13

support during non-academic, extracurricular activities. (*Id.* at 622-23). Thus, contrary to the ALJ's finding of fact, the proposed IEP did provide a dedicated aide for S.B. in kindergarten.

Ms. Moore did testify she had not reached an agreement with ACS as to the type of aide S.B. would have for the 2017-2018 school year. (*Id.* at 213-15). However, the ALJ based her decision in part on the erroneous finding of fact that ACS could not ensure S.B. would have a dedicated aide in kindergarten, not on any determination the aide to be provided by ACS was not trained sufficiently to protect S.B. from exposure to milk products or address such exposure should it occur. Moreover, Ms. Moore's testimony suggests her concern regarding the type of aide S.B. would have related to whether the aide would have training sufficient to reinforce S.B.'s educational programming. (*Id.* at 214-15).

The undersigned notes that in addition to a dedicated aide, S.B.'s proposed IEP for the 2017-2018 school year included a healthcare plan to address his milk allergy. (*Id.* at 622). The contents of that plan are not included in the administrative record, but the measures taken during the 2016-2017 school year to address S.B.'s milk allergy included training teachers to administer an EpiPen in the event S.B. experienced an anaphylactic reaction, training teachers to follow sanitary procedures with respect to the handling of food, ensuring S.B. ate separately from the rest of his

class, and obtaining from Ms. Moore a list of "safe" foods S.B. could consume. (*Id.* at 575-76).

Ms. Moore described the healthcare plan as "cookie cutter, printed probably off the Internet," indicated she raised concerns about it "at almost every IEP [m]eeting," and testified she believed it needed to address S.B.'s milk allergy in more detail, whether S.B. remained in pre-kindergarten or advanced to kindergarten because milk products would be "vastly available in both of those settings." (*Id.* at 233-36.). This testimony indicates a critical inquiry, if not the central issue, with respect to S.B.'s milk allergy was not whether it could be managed in the kindergarten setting but, rather, whether the healthcare plan adequately addressed the allergy, regardless of S.B.'s placement for the 2017-2018 school year. *See Barney v. Akron Bd. of Educ.*, 763 F. App'x 528, 533 (6th Cir. 2019) (holding requirements of IDEA were satisfied where IEP noted student's peanut allergy and school district had separate medical plan to address the allergy). However, the ALJ did not mention or discuss the healthcare plan. For this reason and because S.B.'s proposed IEP for the 2017-2018 school year *did* provide for a dedicated aide, the ALJ's determination that safety concerns related to S.B.'s milk allergy made his advancement to kindergarten inappropriate is not supported by a preponderance of the evidence contained in the administrative record.

**C. S.B.'s Behavior**

The ALJ further faulted S.B.'s proposed IEP for the 2017-2018 school year for failing to provide for the training of a para-educator or include a behavior intervention plan developed by a BCBA to address S.B.'s behavioral issues. (A.R. at 399). However, the proposed IEP did state a functional behavior analysis ("FBA") would be conducted at the beginning of the 2017-2018 school year to determine whether it would be necessary to implement a behavior plan for S.B. (*Id.* at 622). A record of an April 2017 IEP meeting states the BCBA who worked with S.B. for the latter half of the 2016-12017 school year would conduct the FBA and notes Ms. Moore agreed with this plan. (*Id.* at 618). It stands to reason that the beginning of the school year would be best time to determine whether S.B. exhibited behavior that would impede his learning and, if so, develop a plan to address the behavior. Accordingly, the ALJ's determination with respect to a behavior intervention plan is not supported by a preponderance of the evidence contained in the administrative record.

**IV. Conclusion**

For the reasons stated above, the Board's motion for judgment on the administrative record (Doc. 15) is due to be granted to the extent the undersigned concludes the factual findings and legal conclusions made by the ALJ are not supported by a preponderance of the evidence contained in the administrative record.

However, the motion is due to be denied to the extent the Board seeks a declaration S.B.'s proposed IEP for the 2017-2018 school year provided a FAPE and Ms. Moore is not entitled to reimbursement of the costs she incurred that year to educate S.B. privately.

" 'A factually intensive inquiry into the circumstances of each individual child's case is best resolved with the benefit of agency expertise and a fully developed administrative record.'" *Blunt v. Lower Merion Sch. Dist.*, 559 F. Supp. 2d 548, 559 (E.D. Pa. 2008) (quoting *Grieco v. New Jersey Dep't of Educ.*, 2007 WL 1876498, at *7 (D.N.J. June 27, 2007)), *aff'd*, 767 F.3d 247 (3d Cir. 2014). In keeping with the nature of an inquiry into the appropriateness of a disabled child's IEP and the deference accorded to agency expertise, federal district courts have determined remand is the most appropriate remedy where, for example, an ALJ dismisses a request for a due process hearing on statute-of-limitations grounds without conducting an evidentiary hearing or otherwise fails to reach the merits of a plaintiff's claims. *See, e.g., Jenkins v. Butts Cty. Sch. Dist.*, 984 F. Supp. 2d 1368, 1380-81 (M.D. Ga. 2013); *A.B. v. Clarke Cty. Sch. Dist.*, 2009 WL 1606544, at *12 (M.D. Ga. June 8, 2009). While the ALJ here did conduct an evidentiary hearing and reach the merits of claims made by Ms. Moore on behalf of her son, the undersigned determines remand is nonetheless the most appropriate remedy. The ALJ's educational expertise makes her best suited to evaluate the evidence she either

did not consider or misread, some of which requires a credibility determination that she, as the one who received the evidence in the form of in-person testimony, is in the best position to make. Any party aggrieved by the ALJ's decision on remand will have the opportunity to appeal the decision in a civil action. *See Jenkins*, 984 F. Supp. 2d at 1381; *A.B. v. Clarke Cty. Sch. Dist.*, 2009 WL 1606544, at *12.

The undersigned will enter a separate final order consistent with this memorandum opinion.

**DONE** this 28th day of May, 2020.

_____
STACI G. CORNELIUS
U.S. MAGISTRATE JUDGE